So, Mr. Fine, you reserve three minutes for rebuttals. That gives you seven to begin. You may proceed. Thank you, Your Honor. This is a case that's on appeal from the denial of a preliminary injunction by the district court after we had twice been denied at least an opportunity to present an evidentiary hearing, which would enable, I think, a greater precision in deciding whether we had established irreparable harm, the four components that you need to establish an entitlement to preliminary injunction. I'd like to go through the four points where we think the district judge erred. Before you get there, could you just let us know what is the plaintiff's status now vis-à-vis her faculty position at the medical school vis-à-vis the hospital? Thank you, Your Honor. Yes, on October 6th, the plaintiff or the appellant received a letter from the University of Rochester stating that as of September 29th, her privileges had not been renewed. She was no longer on the medical staff and that the university was going to send her name to National Practitioner Data Bank, which would be the death knell of her career, and also to New York Medical Association. Now, we don't know for certain whether that has been done because the letter was somewhat equivocal on the timing. The letter also is unclear to us what that means when you're no longer on the medical staff. She has a lab as well as worked previously in the clinical component of the defendant. The lab has not been shut down yet, but it could be. In July of this year, because she was excluded from working in the clinical NICU, I mean the neonatal intensive care unit, her compensation was slashed by over $50,000, stated because you're not working in the NICU, which they were prohibiting her from working in. She was having a $50,000 cut. But, Your Honor, we don't know exactly, given some of the equivocal language in this October 6th letter, and that was included as an exhibit in a petition for an extraordinary writ that we filed in this court on Friday, exactly what that means. She's not been renewed. She's still not been kicked out of the lab, although it could happen tomorrow. So we're as eager to you to know exactly what her status with University of Rochester is.  But let's go, if we can start, Your Honors, first point with regard to likelihood of success on the merits. Remember that the appellant filed an EEO complaint, as she was required to do as a precedent to filing a Title VII case under the Civil Rights Act, on December 19th of 2023. Eight days later, she is summoned by the defendants or the appellees to discuss what she is told are rumors, that maybe she had done something that some of her colleagues didn't like. She said in response, I need more specifics. How can I respond to an anonymous hearsay allegation? The defendant, and here I apologize, I'm not using names, but if it's all right, I could use University of Rochester as collectively the different defendants, stated, worse, the effect, we haven't investigated any of these things. But we want, but you need to undertake communications training. This is on December 27th, Your Honor. Within moments after that meeting that ended with the appellant saying, until you tell me exactly what I've done wrong so I can respond, I can't accede anything. She is then exiled from clinical work in the neonatal intensive care unit. That was within 24 hours of that December 2023 meeting. What was the, what was it that she complained about to the EEOC? Racial discrimination. Yes, but wasn't that based on the kinds of complaints and issues that were being raised in the meeting? No, that was not. The defendants did not say, well, you filed these with the EEOC and they will respond. That's not the point. They wouldn't say that, and that doesn't keep it from being evidence of retaliation in terms of the temporal proximity. But I'm trying to get, I mean, to take it outside the facts of this case just so you understand the question. If someone is having difficulties with her supervisors and they're making accusations or treating her badly or giving her excessive scrutiny, in her view, and she complains about that to the EEOC, and then meanwhile the supervisors, the same supervisors who she's complaining about, are continuing to complain and the employer is trying to look into that, doesn't that change something about the force of the temporal proximity argument? In other words, the problems that are either discrimination or are legitimate problems with the work predated the EEOC complaint. Well, Your Honor, it's a wonderful inquiry. I think, however, the record doesn't support the narrative because the person who spoke to the appellant said, I don't know anything about any of this. We haven't investigated anything, but we will investigate. Subsequently, there wasn't any investigation. These were what you might call mini-aggressions. We don't live in a culture where people use the N-word anymore, but there are ways that you can convey racial discrimination. I think we are again living, unfortunately, in such a culture. Well, maybe, okay. Maybe I spoke too soon. Certainly in some quarters, especially if you're young and a Republican. I don't want to be partisan. But anyway, Your Honor, that is not what happened. They never did an investigation of these kinds of complaints. And, in fact, when we were at least initially started down the university's fair hearing process, we wanted to put in the evidence of racial discrimination, the fact that allegations of deficient staff interactions. And we were told we couldn't do that, even though the district court at a hearing that denied the preliminary injunction said they need to be able to raise all the issues that explain the discharge from clinical work on December 27th. That never happened, Your Honor. So that we think that that temporal proximity was so close even to the district court that on August 14th, 2024, when there was a preliminary injunction hearing, she told the university, you know, this looks really bad. There's no way you can even win summary judgment on this case because the proximity was eight days between the complaint. Are you going to get to the irreparable injury argument? Because I see your time is running low. Could you address that?  The irreparable injury, we claim, it's similar, although the analogy isn't exact. If you take a building that's on the National Historic Preservation and somebody wants to come in and tear the building down, they know that it's protected because it has unique characteristics. There isn't a damage remedy that could make up for the fact that you destroyed it. Right, but we're talking about someone's employment. No. There are things that can be done, and it seems to me that it is rather routine in cases not just of employment discrimination but of defamation. There are all kinds of situations in which plaintiffs get damages that include specific lost wages like the $50,000 pay cut but also include reputational harm, also include dignitary harm, also include the impact long-range on someone's career from getting fired from this job or opportunities that were lost. These are things that juries evaluate every day in our courts, aren't they? We think that the law is that when the calculation would be exceedingly complex, and most of the cases aren't complex, but in our case we believe that that standard was satisfied because once the appellant is reported to the National Practitioner Database, her career is over. No one will touch her again. She cannot ever practice. She's young. She could win Nobel Prizes. We think you're in the area of stargazing to guess, well, she could have won actually one Nobel Prize. There are, in fact, remedies even in connection with that database, right? I mean, I'm not suggesting here that she should be obliged, as the district court may have thought she was, to exhaust those remedies. But once again, to say her career is over, well, there is an evaluation that takes place under New York law as to whether such an action by a hospital is justified. That doesn't require that it be the result of discrimination. It's just a question of was their affirmative easier, in effect, because it's only about competence, and there's a remedy there. So to say that her career is over is a bit of an oversimplification, isn't it? It's over if there's an independent medical examination later by the New York State authorities, and they decide that, yes, this was a justified firing. But it's certainly not over if they conclude that the university did something outrageous here. Your Honor, first of all, I think that there is a non-monetary element at work here. Well, of course there is. There is in every discrimination case, because in every discrimination case there are all kinds of non-monetary elements. There are emotional damages that are largely speculative and, frankly, to decide as to how badly someone suffered from something. There are dignitary losses. There are the loss of opportunities beyond just what this job was. There are all kinds of things that can be part of that calculation. Your Honor, in this case, because we think it's at least at the edge, we asked for an evidentiary hearing. We certainly made the representation that we think the calculation of damages would be exceedingly complex past the threshold that's required in order to obtain a preliminary injunction. Why does that require an evidentiary hearing? Isn't that the kind of thing that judges decide, again, all the time, as to what judges have experience at trials and juries calculating damages. They know what it takes. You're going to have somebody come in and say the likelihood is she would have gotten the Nobel Prize, but if she can't do this research this year, she never will. I mean, that's very speculative. What is it that the judge would find out about the kinds of career damage that isn't already in the papers and the judge doesn't know about? Well, I'm not sure that the judge considered the elements that you described, but putting aside that fact, we think that there is at least a burden of going forward and explaining, other than just guessing, being non-speculative, what is the formula you're going to use to decide whether she might have won a Nobel Prize, she might have got opportunities to work X, Y, Z, and that could have led to speaking engagements, writing engagements, and things like that. There has never been any articulation of, all right, what is a plausible formula for the calculation of damages? Certainly one element is you get your lost salary, but projecting forward your next 20, 30, 40 years in the profession, that, we believe, gets you into the realm of stargazing, would justify a preliminary injunction. When you add it to the other elements, that we think the balance of equities here were clearly in her favor because there wasn't any suggestion that while this was proceeding, she would be in the NICU even dealing with patients at all. There wasn't any hardship by the university by delaying any decision on her final. You're suggesting there was no possible harm to the hospital because they're not required by your preliminary injunction to put her back in clinical rotation? Isn't that what you're asking to be done? Ultimately, if we can prove our racial discrimination cases, yes. But as the preliminary injunction, what is the relief that you're asking for? The relief we first asked for, we need an evidentiary hearing in order to establish. No, no, no. What is it that you are asking for that you will prove your entitlement to at the evidentiary hearing? Are you asking for just her pay to continue? Are you asking for her title to continue? Or are you not asking that she be placed back in the clinical rotation to continue to do her work? I think we would be satisfied with an injunction that said the status quo remains, that is, as of the fact that we think that they began the retaliation, that would mean compensation is the same, her lab goes undisturbed, and we move forward with an actual evidentiary summary judgment trial on the merits of the racial discrimination claims. A trial. I understand the trial. I'm still trying to understand what is the relief. And what you're telling me it sounds like is the relief you're asking for is pretty much solely things that would be money damage type things. Keep her salary, keep her title. Not put her back in a position of doing the actual work that is partly her research and partly her patient care, which is what the research is based on, right? There's an overlap, Your Honor. There definitely is an overlap between the research and the patient care. Yeah. It's called bed-to-bedside transference. And we think that the relief we asked has basically been undone in part by the October 6th letter that we received saying, all right, she's no longer on the medical staff. She's going to get a letter to the National Data Bank, Practitioner's Data Bank. This is going to be sent to the New York authorities. And at that point, we believe that her medical career is ended. You've speculated as to how they may be able to undo that. Our understanding is that once you're in the National Practitioner's Data Bank, other universities would be foreclosed from hiring her, that she hasn't had any clinical work for over a year and a half. Remember, this began in December 27th of 2023. She's not been in clinical work since that time. And that is exactly what we believe happened with regard to that October 6th letter saying, as of September 29th, like eight or nine days earlier, you're not on the medical staff anymore and we're going to be reporting you. And this is a letter from? The University of Rochester to the appellate. All right. The Board of Governors acted on this? Previously, there was a recommendation that she be removed. And now it's actually happened? Yes. Now it is actually happening. Yes, Your Honor. Just for clarification, because there's some procedural, I don't know, awkwardness, we did file with the Second Circuit a motion for an extraordinary writ under Section 1651 on Friday that includes the letter, the October 6th letter, that wasn't concurrent with the actual discharge of her, which happened according to the letter on September 29th, 2025. We didn't have a case number on that assigned yet. I'm not sure where that is in the system, but that's where that letter comes from, Your Honor. All right. Thank you. Okay. We'll hear from Mr. D'Antonio. Thank you, Your Honor. May it please the Court, Thomas D'Antonio. Judge Lynch, let me respond to a couple of the questions that you had. First, you asked Mr. Fine what the preliminary injunction was in this case. And actually, it was twofold. It was to restore or reassign Dr. Mezu-Endebwisi to clinical activity without restriction. And it was to direct the hospital to grant her, to renew her medical staff appointment without restriction. That's what was asked for. So, you know, I heard a different characterization as to the relief sought, but that's just to be clear. Well, that's what I thought it was, but I guess we can check out what the actual papers say. It's in the record. You're repeating versions of what they're asking for now over what they asked for then. Right. And I think we deal with what they asked for in the record. With regard to her status, Judge Lynch, you also asked what was that. And there are two separate and distinct processes that are at issue here. The first relates to the recommendation by the hospital's medical executive committee that her reappointment to the medical staff be denied. It is a recommendation. And we put into the brief details about all of the intermediate steps that occur between that MEC recommendation and the ultimate determination, Judge Sullivan, by the hospital's board of governors to either accept or deny the recommendation.  So this October 6th letter has nothing to do with this? So there are two letters. There is an October 6th letter, and that does have to do with what the board of governors decided in this case. So that's been decided now. That has been decided, but there's an important fact that Mr. Fine neglected to mention. The next step in the process after the MEC's recommendation, if it's an adverse one like in this case, is that the physician can ask for a hearing before a panel of her peers. She asked for that hearing in September of 2024. It was ultimately because of a series of issues primarily involving the appellant's refusal to engage. The hearing ultimately was scheduled for August 18th. It convened. I was there. The MEC's representatives were there. The panel was there. The presiding judge was there, or the presiding officer was there, but the plaintiff did not appear at all. I understand we're asking you this. I just want to clarify, and we want to hear it. I just want to clarify, all of that took place subsequent to the district court ruling that is on appeal. True enough. True enough. But I think it goes, Judge, to the irreparable injury, and the court also asked for supplemental briefing on that issue. Right. And we put that in. Right. So we know what some of that happened, and we know that more things have happened, and some of that is before this court in the broad sense in this application for an extraordinary writ, which I suppose could be consolidated in such a way that we would have access to whatever information is in that record. Something has to be done about that, but for now we're just trying. We've got a moving target. Right. And so we're just trying to figure out where we are. And I'm trying to arrange the deck chairs here. So the separate question is what, if anything, happened with respect to plaintiff's tenure and plaintiff's employment, which are separate and apart from a medical staff appointment? Right. So that's another thing. I mean, my understanding with medical schools generally is that there is a dual appointment, one at a hospital that is affiliated with the medical school that involves patient care and activities and supervision of residents and that sort of thing, and another that is being part of the teaching faculty of the university. And while those overlap and are conjoined in various ways, they are separate, and I would take it you're going to tell me that there are separate disciplinary or hiring and firing issues as to each. There are. And the issues related to tenure and employment or abrogation of an employment contract are governed by the university's faculty handbook. It's the university's faculty handbook as opposed to, in the case of a medical staff appointment, Strong Memorial Hospital's medical staff appointments. So those are separate and distinct. Now, I believe in one of the applications, because the plaintiff has made several motions to this court, there was a concern expressed with regard to the provost's decision on the university side to begin or to make a referral to an entity called the University Committee on Tenure and Privileges. That referral has not yet been made, but the plaintiff has been given notice that it is being considered, and frankly, I think it likely will occur. Yes, but that is a separate process. Totally separate process. As of this moment, she remains a tenured member of the University of Rochester faculty. Yes, and will remain a tenured member unless and until it goes through all the stages. As that reference is made, a committee does some report. There is some kind of recommendation to whoever it is, board of trustees, president of the university, provost, whoever, makes a final decision before the tenure can start. And then the president's recommendation actually goes to the university's board of trustees.  And all of that is important, and I'm happy to have some more clarification about what it is. But a different question is there's no dispute, is there, that she has already suffered an adverse employment action? I believe the answer to that is yes. There's been an adverse determination. Even from the very beginning, once she is under Muldrow, last year's Supreme Court decision, when she's reassigned out of the neonatal intensive care unit and stripped of patient responsibilities, that's probably already an adverse employment action. Certainly by the time her salary is reduced as a consequence. So that's one element of the course of action. Correct. But that one is present. And we haven't disputed that in our brief. What we have disputed is the reference to the fact that there was no evidence of any issues with her, that she was unaware of any concerns. The reality is that the record, and I think it's on page 34 of our brief. It could be off by a page or two. But there were a series of complaints all in the record, and in the confidential appendix as well, of events that occurred in July of 2023, in September of 2023, in October of 2023, and then finally in December of 2023. The first several of those, the ones through October, were addressed with the plaintiff, and it was clear from the context of these complaints that the plaintiff contended that whenever she made a clinical determination and whenever she wound up talking with her team, she was always clear and they were always on board with what she was doing. But these same events, literally the next day, resulted in a series of complaints from lots of different clinicians in the NICU who were with her. So it was clear that there was some sense that there was a miscommunication at a minimum. She was recommended to receive some communications training. She rejected it. Then when the incidents happened in December, and there were two of them in late December, she was ultimately brought to a meeting with both her division chief as well as the department chair. She walked out of that meeting. And so the reality is that that left them with no choice but to take action with regard to reassigning her away from clinical activity. That reassignment was not anything that impacted her employment, as we noted. In terms of the irreparable injury, Judge Lynch, you pointed out, and it's pretty clear, these are actions that can be remedied. There's this assertion that the OPMC report or the databank report is a death knell to the plaintiff's career. That report actually hasn't been made yet. It has to be made within 30 days of the date. It's under law. It has to be made within 30 days. I see my time has run. May I continue? It has to be made within 30 days of the date that the final determination issues, and that was September 29th. So by the end of the month, that report must be made. But remember, it was made. It needs to be made because the plaintiff waived her rights by failing to appear. Had she appeared on the 18th and put forth her position, as the district court indicated was her right and would have helped inform and make the process before the court right for determination, there would have been ultimately a report from the hearing committee. There would have been then interim reviews all the way up to the Board of Governors of the hospital. And we don't know what that ultimate outcome would be because the plaintiff didn't bother to appear. And just to be very clear, that committee was composed of other doctors from the hospital, but not from her department. Is that the idea? Yes. You're supposed to try to find physicians who have some familiarity with the physician's area of expertise, but not in her direct department. And there's a presiding officer who is not a medical person but is, in effect, a lawyer. In this case, a retired New York State judge was given that role. That's right. This is all part of what I'm going with. This is not some kind of arbitration system or dispute resolution system that takes place in lieu of court proceedings or something like that. This is part of the internal structure of the university making and the hospital making its decision. That's right. The hospital's medical staff bylaws lay out what's called a fair hearing plan, and all of those steps are in it. And the presiding officer is a non-voting member of the panel. In this case, there were four peer physicians who appeared at the hearing. And, again, we're waiting to hear the case. But obviously only one judge showed up. And to be clear, we put before that panel the information that would have justified, at least in our view, the MEC's recommendation. So, you know, if I could briefly ---- But there was some controversy, evidently, over whether the plaintiff would be entitled to put in evidence of discrimination as an alternative explanation for what actions had been taken against her. Yeah, there was a determination that was made by the presiding officer as to the scope of the hearing. Remember, and, you know, Judge Lynch, you're obviously familiar with universities. There are lots and lots and lots of processes. So the plaintiff in this case, her discrimination complaint internally was assigned to the Office of Equality and Inclusiveness, OEI. They investigate and have authority to investigate those allegations. The medical staff proceedings were not focused on those proceedings. And, ultimately, Justice Frazee agreed with us that the scope of the hearing should be limited to the reasons that the MEC's recommendation what was in their recommendation as recited by the letter that she got from the hospital. So it was going to be exclusively a medical decision. It was going to be focused on the reasons that they decided to not recommend her for renewal. Okay. Yes. Just touching briefly on the issue of ---- if I can, again, I'm ---- Go ahead, yeah.  And the district court, I think, was quite clear. The issues that were ultimately going to come back to the court, whether or not the reappointment was appropriate, was discriminatory, was tainted in some way, the court said, we don't know what's going to happen in the future. You need to go through the internal process at the university. Let them make a judgment. If you prevail, then we don't have that issue. If you don't, then you come back to me. New York has a separate wrinkle under the public health law. 2801B of New York's public health law provides that before you can deny privileges at a hospital and renewal of medical staff appointment, if it's for reasons related to patient welfare, patient safety, the objectives of the institution, or character or competence, in those areas, you must also then have your determination brought to the public health council, an entity ---- actually, it used to be called the public health council. Now it's called the Public Health and Health Planning Council. It's the same thing. They have a panel of experts who are assembled in order to protect the physicians and make sure that, in fact, the determination was appropriate. That's a process that Judge Wolfert also indicated should be completed because it would ---- I get that. I guess then my question is, does the October 6th letter change that? Well, it does and it doesn't. And I say it this way, Judge Sullivan. It doesn't in the sense that there is no prohibition against the plaintiff going to the public health council. In other words, that is something that she still has the right to do if she follows the processes, at least as I understand it. But this is with respect to her clinical privileges, right? This is an injunction that would prevent the termination of her clinical privileges. That's right. That's a process that has to take place according to the district court, right? Yeah. And, in fact, now has concluded at least internally at the university by the October 6th letter. I'm wondering, so at least internally means there's more to be done or it's not? Well, by internally, I mean ---- Are her clinical privileges intact or are her clinical privileges removed? Her clinical privileges are no longer in existence. That's okay. And that happened as of the Board of Governors vote on September the 29th that was reflected in the October 6th letter. But the appellant still can seek review at the public health council. I'm going to call it the public health council. And that is something that when I said yes and no, the no piece is I don't know what the record would look like that she would bring to the public health council because she didn't bother to show up on August 18th. I'm only interested with respect to your ripeness argument. So as of today, she doesn't have privileges. As of today, she doesn't have privileges. That's correct. As of today, would this request for injunctive relief be right or not right? I don't think it would be right because she hasn't gone to the public health council. You're saying that she has to exhaust. Yeah. Well, it's not really an exhaustion argument, but what's the case to say? Why is that? There are all kinds of people whose employment is subject to some kind of regulation by states or others, and there are licensing requirements and things of that sort that might apply. But we don't generally say after you've been fired from your job, and that firing has been reported to a licensing authority, you know, the bar or this public health board. We don't usually say you have to exhaust these various state remedies that are not discrimination remedies at all, but that are about something else that might get you some kind of relief. We don't say you have to go through all of that before you can have your Title VII case adjudicated or your 1981 or whatever the theories are of discrimination. So that takes us, Judge Lynch, to the primary jurisdiction point. Yeah. But there's a question, it seems to me, as to our jurisdiction to address an interlocutory order by the district court about management, though, you know, ripeness normally, we think of that as a jurisdictional thing, and that would lead to some sort of possibly even dismissal of the case as not being right. But you're not suggesting that there's no Title III case or controversy here, are you? I'm suggesting that there is not a Title III controversy that is right for determination until the plaintiff goes to the public health council. But why is that? If it's conceded that she has already suffered an adverse employment action, there are lots of Title VII cases where somebody remains employed. They may not remain employed. The situation continues to evolve, but they've got a hostile environment claim or a failure to promote claim or something else that is entirely right. Things have happened that are adverse. The argument is that they were done in a discriminatory manner. We don't usually say that's no case of controversy because you could get your law license back, even though you've been fired by this law firm. So the way that the district court addressed that issue, again, in the tail end of its opinion on January 6th, is that pursuant to the doctrine of primary jurisdiction, the court felt that it would be materially aided by review at the public health council. And the reason is because that determination would help the court parse through whether, in fact, both the prima facie elements of the claim as well as the articulation and the existence of a legitimate nondiscriminatory basis exists. And that's a —  And what you're saying, aren't you really saying that that is a discretionary case management decision by the judge?  That's what we said. It clearly is a matter of discretion with the court. The other thing that we pointed out is while we argued the substance, the merits, if you will, of the primary jurisdiction argument, there is a jurisdictional threshold that we did brief for the court. And in addition to the absence, we think, of appellate jurisdiction over that issue because it deals with — not with the denial of a preliminary injunction and it is not otherwise appealable under Cohen v. Beneficial Life and all those collateral orders doctrine, they also didn't identify that or articulate that in their notice of appeal. The notice of appeal was quite limited. And it took an appeal from the determination that the court made denying the P.I. and denying the TRO. Now, with respect to events that have occurred since the district judge's decision, the plaintiff is perfectly free. This is not like an appeal from a final judgment where the district court loses jurisdiction of the matter because it goes to the court of appeals. The plaintiff is perfectly free to return to the district court with respect to new events that have occurred since the district court's decision to ask for relief on bases that had not yet occurred at the time of the original district court's denial of the preliminary injunction. Isn't that correct? That's not only correct. Judge LaValle's plaintiff has done that. She filed a new lawsuit in September. I'm not talking about by filing a new lawsuit. She can file a new lawsuit. But even within the framework of the same lawsuit, the fact that there's been an appeal from a denial of a preliminary injunction doesn't deprive the district court of jurisdiction or authority to hear new applications based on new things that have happened. Absolutely, yes. I agree. Yes. And we're not fact-finding. We can't find facts with respect to events that have occurred since the district court ruled on the application that was before it at the time. No, no question. You know, I provided that information in response to inquiries, but the reality is you're right. I mean, we are dealing with this order issued on January 6th on this record. Yes. If there's a subsequent application, we'll deal with it then. All right. Thank you. Thanks very much. I appreciate the indulgence. I realize I was way over. Well, we were asking questions. We set limits, and it's respectful to say I've hit the limit. But if we have more questions, we'll ask them. All right. Mr. Fein, you have three minutes for public comment. Thank you, Your Honor. I feel a little bit like watching the play Hamlet without the Prince of Denmark, number one, with regard to the October 6th letter. There's nothing that's ambiguous about the final decision. I'm reading here from the last paragraph. This is Exhibit 2, I think, in the Mandamus, the extraordinary writ application. Please be advised as required under the Health Care Quality Improvement Act of 1986, Strong Memorial Hospital will report this action. This is the termination, the final termination of being on the medical staff. Right. I think it's been conceded that, A, that is a final action by the Board of Governors, so that issue of it has to go through all those steps is no longer applicable, and, B, that it is required, although they haven't maybe reported it yet, it is required that it be reported within 30 days, and they say they're going to comply with that.  And they will do that. And our position is that, as a practical matter, it ends premedically.  But that's the subject of your writ also. We got that. One. Now, secondly, with regard to Title VII and Section 1981 retaliation, there's nothing in the Federal statute, and we're talking about Federal claims, that requires any exhaustion or, you know, administrative action. Right. Except for the EOC, which was done. Let's assume for the sake of the argument that that is absolutely correct. Where is our appellate jurisdiction to address a district court's decision to stay its hand while things happen? Okay. Now, this goes back, Your Honor, to raise this question about the preliminary injunction. This is the procedural posture of the case when we denied a preliminary injunction first on August 14th. And at that hearing, the district judge says, among other things, I expect in the administrative process that the appellant, Dr. Messick, would have a full opportunity to explore the foundation of the December 27th expulsion of clinical work. And that they would be fulsome in permitting her, you know, to have a full due process hearing. Right. Arguably, that isn't exactly what happened. That didn't happen. But all of that goes, once again, to if the district judge expected that certain things were going to happen and that was a basis for the ruling and that didn't happen, you can go back to the district judge and deal with that. That's what we did, Your Honor. Right. That's exactly what we did. Because what happened procedurally is that we first, based upon the district court's statement on the record, we said, these are the issues we think that are appropriate, that include fact-finding that would be relevant to the race discrimination claims. And these are the witnesses that we'd like to call. Now, after we went down that road, we discovered that, in fact, the presiding officer had been selected by the vet. Of course it was. So were the doctors who were on the panel. They've been appointed by the hospital. Excuse me. There is no requirement at law. This is not an arbitrator. There's no requirement that the people who are making the decision or making a recommendation to the Board of Governors on behalf of the hospital not be employed by the hospital. They all will be. The doctors will be. These are not outside people. They are putatively, I think, and I don't think you've contested that, they're people who aren't involved in the underlying controversy, but they are still all university employees, right? Hospital employees. But the presiding judge was not, Your Honor. Of course not. But it's still, your complaint is the presiding officer is someone being paid by the hospital or the university, but so are all the other people, all those doctors on the panel. There's no need for them to get under law, for them to get a retired judge of any sort to come in or a lawyer of any sort to come in. They could have had a doctor. They could have had a dean. They could have had an administrator be occupying that role. So I don't understand what your problem is with the fact that this is someone who was selected by the hospital, as were all of the other members of the board, or was being paid by the hospital, as were all the other members of the board. What's wrong with that? The problem that we believe is Title VII, Section 1981 retaliation doesn't require us to go through all of those mechanisms, which delay things enormously. We are now almost too late. Well, it depends what you're complaining about. I mean, you're complaining that something has happened. I understand that. That was my point to your adversary, that there's already been an adverse employment action, even while she is still – still has her employment. But the case is evolving. And we went back to the district court, Your Honor, exactly like you suggested. We said this doesn't work for us anymore. We think under Title VII, under 1981, we have a right to an Article III court to decide our race discrimination cases. Yes. We may lose. And that because none of the allegations – Yeah, but that's not what we're talking about here. You haven't been stripped of that right. There hasn't been summary judgment against you. We're talking about two rather specific things. One, whether there's an entitlement to a preliminary injunction. And two, whether the district court's decision to await the outcome of the state proceedings was proper. Those are the two issues that you've raised. Well, I think – Under Title VII, yes. And the second one we may not have jurisdiction over. Whether you were entitled to a preliminary injunction as of the time and on the record that was before the district court when it made this order. Yes, Your Honor, you are absolutely correct. There was January 6th. There were two denials of preliminary injunction. The first was August 14th. Then we went down the road and didn't complete participation in the internal process because we think it was not going to help the judge resolve our race discrimination cases under federal law. Well, you may think that, but the judge thought otherwise. Well, and that's why we went back to the judge and were unable to convince her. We think the record – The question is truly a simple one. Do we have appellate jurisdiction over the district court's decision to stay aspects of a case that has not been dismissed? And the only way I think it would be is if it is inextricably intertwined with your preliminary injunction motion. And so why is that? Why is it inextricably intertwined? The timing that the court cited when deciding to stay the motion to dismiss and your P.I. motion. Well, I think the balance of – it's relevant, I believe, Your Honor, when you consider the four elements that the plaintiff is required to satisfy to obtain a preliminary injunction. This – we're now almost past two years since the appellant was exiled from clinical work. We're nowhere close to any final resolution of anything. As you can tell from even my opponent's representation of how complicated and extensive these internal State and internal University of Rochester processes are, we could be another year and a half. We think that's relevant to deciding whether there's irreparable harm to the balance of equities in our favor. We may still lose on the actual racial discrimination cases, claims, but we're entitled to an article-free judgment. I think I get it. So we will reserve decision on this appeal.